ORDERED.

**Dated:  June 22, 2017**

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re

VERNON M. LEE                                    Case No.:  8:15-bk-01038-KRM
                                                 Chapter 7

        Debtor.
_____/

BURTON W. WIAND as receiver for,
Valhalla Investment Partners, P.L.
Viking Fund, LLC, Viking IRA Fund LLC,
Victory Fund, LTD, Victory IRA Fund, LTD,
Scoop Real Estate, L.P., and Traders
Investment Club,

        Plaintiff,

v.                                               Adv. Pro. No.:  8:15-ap-464-KRM

VERNON M. LEE, individually and as
Trustee of the Vernon M. Lee Trust, and
MANON SOMMERS-LEE,

        Defendants.
_____/

## MEMORANDUM OPINION GRANTING
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The court-appointed receiver ("Receiver") for the entities involved in a Ponzi scheme

seeks the imposition of an equitable lien and constructive trust on the Florida homestead of

Vernon Lee (the "Debtor") and his wife ("Sommers-Lee").[1]  Between 2005 and 2008, the

Debtor, then unmarried, received distributions from the Ponzi scheme totaling $2,942,264, which

exceeded the amount of his investments by more than $1 million.[2]  The District Court has

determined that these excess proceeds were fraudulent transfers, resulting in a judgment against

Debtor for $935,631.57.[3]

FACTUAL BACKGROUND

The Debtor deposited all of his Ponzi scheme distributions into three brokerage accounts

at Fidelity Investments; two of which are relevant to this dispute ("**Account 2750**" and "**Account**

**2887**," collectively, the "Fidelity Accounts").[4]  On February 25, 2008, the Debtor purchased a

home with $227,126.78 drawn from Account 2887.[5]  That account had been augmented about

ten days earlier, on February 14, 2008, by the Debtor's deposit of $100,000 from Account 2750.

At that time, Account 2750 had a balance of $256,710, including $100,000 received directly

from the Ponzi scheme and $156,710 from other sources.  Immediately after the house purchase,

---

[1] *See S.E.C. v. Nadel, et al.*, Case No. 8:09-cv-87-T-26TBM (M.D. Fla.).  Burton W. Wiand was appointed to be the receiver for Valhalla Investment Partners, P.L., Viking Fund, LLC, Viking IRA Fund LLC, Victory Fund, LTD, Victory IRA Fund, LTD, Scoop Real Estate, L.P., and Traders Investment Club.

[2] Debtor invested about $1,873,262 in the Ponzi scheme. *See Report and Recommendation*, Case No. 8:10-CV-210-T-17MAP, at 17, filed in this adversary proceeding as Doc. No. 16-2 ("*Report*").  He received distributions from July 2005 to October 2008 totaling about $2,942,265. *Id*. at 17-18. The Debtor received about $1,069,003 more than he invested.  *Id.* at 18.

[3] *Wiand v. Lee*, 2013 WL 247361 (M.D. Fla. 2013).  The District Court adopted and incorporated by reference the *Report*.  The Receiver had previously recovered $133,371 from the Debtor's children, leaving approximately $935,631 as the judgment amount. *Id*. at *2.  The Receiver filed a proof of claim in the Debtor's bankruptcy case (Claim No. 1) in the amount of $1,391,269.41, which includes the judgment amount plus his calculation of pre- and post-judgment interest.

[4] *Answer to Complaint Seeking Imposition of Equitable Lien on Florida Homestead and Objecting to Debtor's Discharge Pursuant to Bankruptcy Code Section 727* (Doc. No. 4), paragraph 33.  These accounts were titled as "Vernon M Lee – Roth Individual Retirement Account – FMTC Custodian," and "Vernon M Lee and Nancy E Lee – With Rights of Survivorship," respectively.

[5] This was paid by three withdrawals from Account 2887:  $5,000.00 on February 6, 2008, $20,000.00 on February 7, 2008, and $202,126.78 on February 25, 2008.

$21,419.20 remained in Account 2887.  Debtor and Sommers-Lee (together referred to as "Defendants") married in 2010.[6]

Defendants allege that after the Debtor purchased the home, Debtor added $70,600 of untainted funds to Account 2887.[7]  Defendants contend that between March 28, 2008, and April 15, 2008, they made improvements to the home, which expenses were paid primarily from Account 2887.[8]

Debtor filed this Chapter 7 case in 2015,[9] shortly after the Eleventh Circuit affirmed the District Court's fraudulent transfer judgment.[10]  In the Chapter 7 case, the Debtor listed his home as exempt under Florida's constitutional homestead exemption and as a tenancy-by-the-entireties with his wife.[11]

On April 10, 2015, the Receiver filed an objection to the claims of exemption, asserting that since the home had been purchased with fraudulent transfers from the Ponzi scheme before the Defendants were married, Debtor was not entitled to either exemption.[12]  The Defendants

---

[6] Sommers-Lee was granted a life estate at the time the house was purchased.  The Debtor's trust, which took title to the house, held the remainder interest.  Sommers-Lee and the trust conveyed their interests in the property to Debtor and Sommers-Lee as tenants by the entireties on November 5, 2010.

[7] Affidavit of Debtor, Doc. No. 22-1, ¶ 4.  Debtor claims to have deposited Social Security benefits, Boeing retirement program payments, and other savings into Account 2887 after the home was purchased.

[8] *Id.* at ¶¶ 12-13.  Most of these improvements were paid from Account 2887: $32,070.62 directly, and $29,664.14 used to pay charges on a Visa credit card.  Defendants also allege that Sommers-Lee used $11,932.52 of her own money for home improvements.  *Id.* at ¶ 15.  Defendants do not state the source of the other $5,121.32 allegedly spent on home improvements.

[9] Debtor's voluntary petition was filed on February 2, 2015.

[10] *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2014).

[11] Fla. Const. Art. X, § 4(a)(1); Fla. Stat. Ann. §§ 222.01 and 222.02; 11 U.S.C. § 522(b)(3)(B).

[12] *Creditor's Objection to Claim of Exemptions*, (Main Case Doc. No. 14).  The Court's consideration on the objection has been abated until the conclusion of the present adversary proceeding.  *See* Main Case Doc. No. 32.

have not been accused of any wrongdoing associated with Nadel's Ponzi scheme, only that they are the undeserving beneficiaries of the false profits derived therefrom.[13]

In turn, the Receiver filed a complaint against the Debtor (individually and in his capacity as the trustee of the Vernon M. Lee Trust) and his non-debtor wife.  The Receiver then filed a motion for partial summary judgment on his claims for the imposition of an equitable lien and a constructive trust on Defendants' homestead.[14]

ANALYSIS

A.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law."[15]  "The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.  If the moving party meets this initial burden, the non-movant must demonstrate the existence of a genuine issue of material fact."[16]

B.  Equitable Lien and Constructive Trust

The Receiver seeks the imposition of an equitable lien and a constructive trust against the Defendants' homestead, because substantially all of the funds used to purchase it originated from the fraudulent transfers.  He relies on the affidavit of forensic accountant Maria M. Yip ("Ms.

---

[13] *See Report* at 38.  It is uncontested that Debtor believed his investments in the funds were legitimate and that he had no knowledge of the Ponzi scheme at the time he received distributions.

[14] Doc. No. 16.

[15] Fed. R. Civ. P. 56(a), made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7056.

[16] *Fitzpatrick v. City of Atlanta*, 2 F.3d 112, 116 (11th Cir. 1993).

Yip"), who opined that $227,127 of such transfers can be identified as passing through the Debtor's Fidelity Accounts into the home.[17]

The Defendants counter that no more than $127,126.78 can be traced to Ponzi scheme proceeds, because $100,000 of the purchase price came from commingled funds in Account 2750. Defendants also claim that they should receive a "credit," of as much as $87,653.84, for their home improvements.[18]

The imposition of an equitable lien falls squarely within a recognized exception to Florida's homestead exemption. *Havoco of America, Ltd. v. Hill* is the leading case, holding that a Florida homestead is protected from creditors' claims even if money was put into a home with the owner's specific intent to hinder, delay, or defraud creditors.[19] The Florida Supreme Court noted in that opinion, however, that an equitable lien may be imposed "where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead."[20]

The question presented here is whether that exception requires that the fraud or the egregious conduct be committed by the homeowner who is claiming the exemption. In this case, the Debtor passively received the fraudulent transfers and used them to buy the house. It is not alleged that he or his wife engaged in any fraud or egregious conduct.

In *Palm Beach Savings & Loan Association, F.S.A. v. Fishbein*,[21] decided before *Havoco*, the Florida Supreme Court affirmed the imposition of an equitable lien on the homestead of Mrs.

---

[17] Doc. No. 16-5.

[18] Doc. No. 22, p. 13.

[19] 790 So.2d 1018, 1030 (Fla. 2001).

[20] *Id.* at 1028.

[21] 619 So.2d 267 (Fla. 1993).

Fishbein, who was the unknowing beneficiary of a fraud committed by her husband.[22]  He had forged her signature to obtain a fourth mortgage;[23] then, he used a portion of the loan proceeds to satisfy the three existing mortgages.[24]  Ultimately, Mrs. Fishbein became the sole owner of the property.[25]  When the lender attempted to foreclose, she asserted that it was precluded from doing so because she was innocent of her husband's fraud and was, therefore, entitled to the full homestead exemption.[26]  The lender's mortgage was invalid because of the forgery, but the trial court granted the lender an equitable lien on the homestead,[27] which the Florida Supreme Court upheld.[28]  Otherwise, Mrs. Fishbein would have received a windfall from the satisfaction of the three pre-existing mortgages and the voiding of the foreclosing lender's lien.[29]

In 2001, the bankruptcy court for the Southern District of Florida imposed an equitable lien and constructive trust against the Florida homestead of a Mrs. Levy, whose husband was involved, through his brokerage firm, in a Ponzi scheme operated by Financial Federated Title and Trust, Inc. ("FinFed").[30]  The Levys had purchased their homestead with Ponzi scheme funds collected through Mr. Levy's company.  Mrs. Levy was not involved in FinFed's fraud,

---

[22] *Id*. at 268.

[23] *Id*.

[24] *Id*.

[25] *Id* at 269.

[26] *Id*.

[27] *Id*.  The equitable lien was limited to $930,000, the amount of funds traced directly into the homestead through the payoff of the existing mortgages.  *Id*. at 271.

[28] *Id*.

[29] *Id*.

[30] *In re Fin. Fed. Title & Tr., Inc.*, 273 B.R. 706 (Bankr. S.D. Fla. 2001), *subsequently aff'd sub nom. In re Fin. Fed. Title & Tr., Inc.*, 347 F.3d 880 (11th Cir. 2003).

but her "innocence" was considered irrelevant because the underlying funds used to purchase the home were obtained through fraud.[31]

The Eleventh Circuit affirmed, adopting the bankruptcy court's reasoning in full:

"Roseann Levy asserts that her lack of knowledge or involvement in the Debtor's massive fraudulent activity exonerates her from liability and renders the holdings of *Jones* and *Fishbein* inapplicable to her. However, a lack of knowledge on the part of the person asserting the homestead exemption does not change this analysis, as it is the fraudulent nature of the funds which is of utmost importance."[32]

Defendants seek to distinguish the foregoing decisions on the ground that neither Debtor, nor his wife, was engaged in the Ponzi scheme. But, the Florida Supreme Court has already rejected that argument. In *Fishbein*, the underlying decision was premised on the stated principle that "*the only basis on which a court may impose an equitable lien is where there is fraud or egregious conduct by the party claiming the homestead exemption.*"[33] On appeal, the Supreme Court rejected that rule, basing its decision on preventing unjust enrichment:

"[T]he court below was not so concerned with the constitutional language as it was with its belief that an equitable lien could not be imposed because Mrs. Fishbein was not a party to the fraud. Yet, there was no fraud involved in either

---

[31] 273 B.R. at 716-17.

[32] *In re Fin. Fed. Title & Tr., Inc.*, 347 F.3d 880, 890 (11th Cir. 1983). *See also*, *In re Hecker*, 264 F. App'x at 789-91 ("Both this Court . . . and the Florida Supreme Court . . . have explained why an equitable lien may be imposed upon property benefited by fraudulent proceeds even where one co-owner spouse is innocent and ignorant of the fraud. The answer is straightforward: if an equitable lien is not placed on the property to the extent Hecker's fraudulently obtained funds benefited the land, Gloria would be unjustly enriched."); *S.E.C. v. Aquacell Batteries, Inc.*, 2008 WL 2915064, *3 (M.D. Fla. 2008) ("Although counsel for the daughters stressed that the daughters were not involved in Aquacell's day-to-day operations and did not 'know' of any wrongdoing, that does not mean that it did not occur and that the funds they admit to receiving were not the proceeds of fraud."); *Sweeteners Plus, Inc. v. Glob. Supply Source, Inc.*, 2013 WL 6890857, *8 (M.D. Fla. 2013) ("Although there is no evidence that [the spouse] participated in the fraud, she unjustly benefitted by receiving title to the property purchased with Sweeteners' funds; thus, there is no homestead protection inuring to interest of [the spouse] in the property.").

[33] *Fishbein v. Palm Beach Sav. & Loan Ass'n, F.S.A.*, 585 So.2d 1052, 1056 (Fla. 4th D.C.A. 1991) (emphasis added).

*La Mar* or *Sonneman*. In those cases, the equitable liens were imposed to prevent unjust enrichment."[34]

Likewise, the Fifth Circuit Court of Appeals, in *Crawford v. Silette*,[35] upheld the imposition of an equitable lien on a Florida homestead where false profits from a Ponzi scheme were used to pay off the mortgage. The homeowner was unaware that the funds she had received as a gift from her boyfriend came from a Ponzi scheme.[36] She asserted that the Florida homestead exemption barred an equitable lien because she was not complicit in the fraud.[37] After reviewing *Havoco, Fishbein*, and *FinFed*, the Fifth Circuit concluded that a homeowner's "innocence" was irrelevant because "the focus is on unjust enrichment, not fraud."[38] Otherwise, the homeowner will receive a windfall.[39]

Accordingly, this Court concludes that it is appropriate to impose an equitable lien on the Defendants' homestead to prevent their unjust enrichment from the funds traced to the Ponzi scheme. The Debtor received $1,069,002.60 of fraudulent transfers from the Ponzi scheme.[40] The Debtor maintains that all of those funds, including the funds used to buy the house, have been spent.[41] The focus is not on the Defendants' culpability, but on the necessity of preventing

---

[34] *Fishbein*, 619 So.2d at 270 (citing *La Mar v. Lechlider*, 135 Fla. 703, 185 So. 833 (1939) and *Sonneman v. Tuszynski*, 139 Fla. 824, 191 So. 18 (1939)) ("Moreover, in both cases the homestead interest of the spouse of the party whose conduct led to the unjust enrichment was also subject to the equitable lien").

[35] 608 F.3d 275 (5th Cir. 2010).

[36] *Id.* at 277.

[37] *Id.* at 278-79.

[38] *Id.* at 280-81.

[39] *Id.*

[40] *See Report* at 21.

[41] *See* Debtor's schedules (Main Case, Doc. No. 1), in which Debtor lists personal property of only $5,866, including funds of $2,301 in checking or investment accounts. The Receiver alleges that "[a]side from the [house at issue], the Debtor has no material assets because he admittedly gabled away hundreds of thousands of dollars [prior to this bankruptcy.]" Doc. No. 16, p. 3.

or mitigating their unjust enrichment by permitting fraudulent transfers to be sheltered in their homestead.

The Receiver also seeks the imposition of a constructive trust, as an additional remedy to allow him to take control of Defendants' home and sell it. The remedy of a constructive trust is not limited, as Defendants argue, to remedy abuses in confidential or fiduciary relationships. In *American National Bank v. Federal Deposit Insurance Corp.*,[42] the Eleventh Circuit, relying on the Florida Supreme Court case of *Quinn v. Phipps*,[43] recognized that "actual fraud" or "abuse of confidence" are alternative bases for the imposition of a constructive trust:

> "A constructive trust is one raised by equity in respect of property which has been acquired by fraud, *or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it* . . . [E]quity will raise a constructive trust and compel restoration, where one through actual fraud, abuse of confidence reposed or accepted, *or through other questionable means* gains something for himself which in equity and good conscience he should not be permitted to hold."[44]

Imposing a constructive trust is an appropriate remedy for unjust enrichment.[45] Courts have authorized this remedy even in the absence of a confidential relationship between the defendant and the claimant.[46]

---

[42] 710 F.2d 1528 (11th Cir. 1983).

[43] 93 Fla. 805, 113 So. 419 (Fla. 1927).

[44] *Am. Nat. Bank of Jacksonville*, 710 F.2d at 1541 (emphasis in original).

[45] *See Fin. Fed.*, 347 F.3d at 891 ("The doctrine of constructive trusts is a recognized tool of equity designed in certain situations to right a wrong committed and to prevent unjust enrichment of one person at the expense of another either as a result of fraud, undue influence, abuse of confidence or mistake in the transaction."); *In re First Fid. Fin. Servs., Inc.*, 36 B.R. 508, 511 (Bankr. S.D. Fla. 1983) ("The reason for imposing a constructive trust is to avoid unjust enrichment to the recipient of the windfall, and to do equity for the party whose property has been misused.")

[46] *See Fin. Fed.* 347 F.3d 880; *Sweeteners Plus, Inc. v. Glob. Supply Source*, 2013 WL 6890857 (M.D. Fla. Dec. 31, 2013); *S.E.C. v. Aquacell Batteries, Inc.*, 2008 WL 2915064 (M.D. Fla. July 24, 2008); *See also In re Estate of Tolin*, 622 So.2d 988, 990-991 (Fla. 1993) ("A constructive trust is properly imposed when . . . one party is unjustly enriched at the expense of another. Although this equitable remedy is usually limited to circumstances in which fraud *or* a breach of confidence has occurred, it is proper in cases in which one party has benefited by the mistake of another at the expense of a third party.") (internal citations omitted) (emphasis added); *Silver v. Digges,* 2006 WL

Here, Defendants have been unjustly enriched by the receipt of the fraudulent transfers that they invested in their home.  Under the constructive trust doctrine, the rightful owner of misappropriated trust property may trace whatever has been bought with the trust proceeds to the extent such property can be substantially identified as having been acquired with the misappropriated property or funds.[47]

There is a final judgment determining that Debtor received $935,631 of fraudulent transfers.  Thus, Debtor did not have rightful ownership of those funds, which must be considered as being held in trust for the benefit of the receivership.[48]  A constructive trust will be imposed to the extent of the Ponzi scheme distributions are traceable into Defendants' home.

D.  Extent of the Equitable Lien and Constructive Trust

The parties disagree on whether $100,000 of the funds used for the home purchase price can be identified as being derived from the Ponzi scheme.  The Receiver's forensic accountant, Maria Yip, traced distributions from one of the entities, Victory IRA Fund Ltd. ("Victory Fund"), to Debtor's Fidelity Accounts before he purchased his home.[49]

Ms. Yip utilized several assumptions in her analysis: (1) the fraudulent transfers deposited into the Fidelity Accounts belong to the Receiver, but are considered to be held in trust by the Debtor; (2) payments by the Debtor to third parties are considered, first, to be from his

---

2024935, at *4 (M.D. Fla. July 17, 2006) (citing *Wadlington v. Edwards*, 92 So.2d 629, 631 (Fla. 1957)) ("[A]lthough a number of Florida appellate courts have stated that a "confidential relationship" is a necessary element to a constructive trust, the Florida Supreme court considers the breach of a confidential relationship as but one of several circumstances in which the imposition of a constructive trust is equitable and just.").

[47] *In re Hecker*, 316 B.R. 375, 387 (Bankr. S.D. Fla. 2004) *aff'd* 264 F. App'x 786 (11th Cir. 2008) (citing *Republic of Haiti v. Crown Charters, Inc.*, 667 F.Supp. 839, 843 (S.D. Fla. 1987).

[48] *Id.*

[49] *Declaration of Maria M. Yip, CPA, CFE, CIRA Regarding Vernon M. Lee's use of Proceeds from the Nadel Ponzi Scheme to Acquire Real Property in Sarasota, Florida* ("Yip Declaration"), Doc. No. 16, Exhibit 5, at 8-9.

untainted funds; (3) the funds received from the Ponzi scheme (trust funds) are limited to the "lowest intermediate balance" in each account after their being deposited; (4) deposits from any other source are assumed to be untainted funds; and (5) Ponzi scheme funds moved by Debtor into another of his accounts are considered to retain their character as trust funds.  Ms. Yip concluded that "it is clear that [Debtor] purchased the [home] with funds in the amount of $227,126.78 that are traceable to the [f]alse [p]rofits from Nadel's Ponzi scheme."[50]

The "lowest intermediate balance rule" is an acceptable method for treating trust proceeds that have been commingled with other funds:[51] where trust funds are commingled in an account they are considered as undiminished so long as the total account balance is at least equal to the amount of the trust fund deposits.[52]  If the aggregate amount of trust deposits exceeds the lowest intermediate balance in the account, they are considered lost.[53]  Thus, "the lowest intermediate balance in a commingled account represents trust funds that have never been dissipated and which are reasonably identifiable."[54]  This method has been approved by courts in cases requiring the tracing of money through accounts where assets have been commingled.[55]

---

[50] *Yip Declaration* at 11.

[51] *Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988).  *See In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1063 (3rd Cir. 1993); *In re Dameron*, 155 F.3d 718, 724 (4th Cir. 1998); *First Fed. of Mich. v. Barrow*, 878 F.2d 912, 916 (6th Cir. 1989).

[52] The lowest intermediate balance rule "attempts to divide tainted and untainted money by considering, where a set amount of proceeds is commingled with other funds, the account to be 'traceable proceeds' to the extent of [the deposited proceeds] as long as the account balance never falls below that sum."  *In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1214 (11th Cir. 2013).  This method "is used to determine the rights of a trust beneficiary to a trustee's bank account in which trust funds ant the trustee's personal funds have been commingled." *U.S. v. Banco Cafetero Pan.*, 797 F.2d 1154, 1159 (2nd Cir. 1986).  *See also Conn. Gen.*, 838 F.2d at 619.

[53] *Id.*

[54] *Columbia Gas*, 997 F.2d at 1063.

[55] *See In re Hecker*, 316 B.R. 375 (Bankr. S.D. Fla. 2004) *aff'd* 264 F. App'x 786, 788 (11th Cir. 2008); *Matter of Felton's Foodway, Inc.*, 49 B.R. 106 (Bankr. M.D. Fla. 1985).

Essentially, this method imposes several presumptions on the custodian of a trust *res*,

where trust assets are commingled with other funds, for the purpose of preserving the trust *res*.

According to the Restatement (Second) of Trusts:

> "Where the trustee deposits in a single account . . . trust funds and his individual
> funds, and makes withdrawals from the deposit and dissipates the money so
> withdrawn, and subsequently makes additional deposits of his individual funds in
> the account, the beneficiary cannot ordinarily enforce an equitable lien upon the
> deposit for a sum greater than the lowest intermediate balance of the deposit.  If
> the amount of deposit at all times after the deposit of the trust funds equaled or
> exceed the amount of trust funds deposited, the beneficiary is entitled to a lien
> upon the deposit for the full amount of the trust funds deposited in the account.  If
> after the deposit of trust funds in the account the deposit was wholly exhausted by
> withdrawals before subsequent deposits of the trustee's individual funds were
> made, the beneficiary's lien upon the deposit is extinguished, and if he is unable
> to trace the money withdrawn, he is relegated to a mere personal claim against the
> trustee, and is entitled to no priority over other creditors of the trustee."[56]

Tracing does not require that each dollar be specifically accounted for at all points in

time; it requires only that tainted funds be identified and followed from the point of origin (i.e.

the fraudulent act).[57]  The commingling of funds does not preempt tracing.[58]  There need only be

sufficient proof to permit the identification of the funds through the various transfers.[59]  A

"dollar-for-dollar" accounting is not required.[60]

---

[56] Restatement (Second) of Trusts § 202 (1959), cmt j.

[57] *In re Hecker*, 316 B.R. at 387 ("It is hardly fatal to a claim of constructive trust or equitable lien that the property
originally subject to the claim is money, which is fungible, or that the money is transferred through various accounts
or converted into different forms.")

[58] *In re Mazon*, 387 B.R. 641, 646 (M.D. Fla. 2008) (citing *In re Seneca Oil Co.*, 906 F.2d 1445, 1452 (10th Cir.
1990)); *Post-Confirmation Comm. for Small Loans, Inc. v. Martin*, 2016 WL 3248369 at *13 (M.D. Ga. 2016)
(citing *Watts v. MTC Dev., LLC (In re Palisades at W. Paces Imaging Ctr., LLC)*, 501 B.R. 896, 917 (Bankr. N.D.
Ga. 2013)); *In re Dameron*, 155 F.3d 718, 723-24 (4th Cir. 1998) ("…courts have consistently rejected the notion
that commingling of trust property, without more, is sufficient to defeat tracing"); *See In re Int'l Admin. Servs., Inc.*,
408 F.3d 689 (11th Cir. 2005).

[59] *See Int'l Admin. Servs., Inc.*, 408 F.3d at 709 ("It is undeniable that equity will follow a fund through any number
of transmutations, and preserve it for the owner as long as it can be identified.") (quoting *In re Bridge*, 90 B.R. 839,
848 (Bankr. E.D. Mich. 1988) and citing *Farmers & Mechs.' Nat'l Bank v. King*, 57 Pa. 202 (1868)).  *See also In re
Hecker*, 316 B.R. at 387.

[60] *Int'l Admin. Servs., Inc.*, 408 F.3d at. 708.

Defendants urge the Court to adopt a different accounting method – either the "first-in-first-out" method, or the "pro rata distribution" method.[61]  But, these methods would allow Defendants to keep a larger portion of their unjust enrichment.  The Debtor has dissipated nearly $1 million of Ponzi scheme funds that were fraudulently transferred to him.  There is nothing else for the Receiver, on behalf of other Ponzi scheme victims, to recover.  The use of either the first-in-first-out or pro rata method would give the Defendants a windfall.  Moreover, they have not provided any legal authority to justify these alternative methods.[62]

According to Ms. Yip's declaration, the fraudulent transfers from the Ponzi scheme to Debtor can be summarized, as follows:

1.  After June 30, 2006, substantially all the funds deposited into a third Fidelity account, **Account 4198,** came from nine Victory Fund distributions; subsequently, Debtor made two transfers from this account, totaling $272,728.61, to his Account 2887.

2.  In September of 2007, **Account 2750** had a balance of $153,303.14 (assumed by Ms. Yip to be untainted funds); thereafter, four distributions of Ponzi scheme proceeds, totaling $100,000, were received from the Victory Fund and deposited into Account

---

[61] The Debtor's Account 2750 held $153,000 of funds (assumed by Ms. Yip to be untainted) before the four distributions totaling $100,000 were received from the Victory Fund.  Since the funds remaining in Account 2750 after the transfer to Account 2887 totaled $156,710.12, the $100,000 would be deemed under the "first-in-first-out" method to have come from the earlier, untainted funds.  The equitable lien and constructive trust would be limited to $127,127.

The pro rata approach would focus on the relative percentage of the tainted funds ($100,000) to the total ($256,710) in the account.  Under this approach, only 39% of the transfer to Account 2887, or $39,000, would be considered tainted, because 39% of the funds held in Account 2750 were tainted at the time of the transfer.  Accordingly, the equitable lien and constructive trust would preserve only $160,127 ($127,127 + $39,000).  This accounting method, however, is to be employed when there are multiple and similarly situated beneficiaries.  *See In re Strategic Tech., Inc.*, 142 F. App'x 562, 566-67 (3rd Cir. 2005); *Goldberg v. N.J. Lawyers' Fund for Client Prot.*, 932 F.2d 273, 280 (3rd Cir. 1991) ("In general, courts favor a pro rata distribution of funds when such funds are claimed by creditors of like status.")

[62] The Defendants cite two cases, but neither supports their argument.  *In re Foster*, 275 F.3d 924 (10th Cir. 2001) stands for the proposition that the lowest intermediate balance rule should not be utilized where there are multiple equally-situated parties that have rights in the trust funds.  *In re Tax Group, LLC*, 439 B.R. 78 (2010), also cited by the Defendants, stands for the proposition that the pro-rata approach should be utilized when there are multiple claimants to trust funds.  Neither case is applicable here, because the Receiver is the only party with a claim of right to all of the trust funds.

2750;[63] on February 14, 2008, $100,000 was transferred to Account 2887; the remaining balance in Account 2750 thereafter was $156,710.12.

3. On October 31, 2007, **Account 2887** had a balance of only $5,582; by December 31, 2007, the balance grew to $282,966.71, including the transfers of $272,728.61 from Account 4198.

4. After a series of payments to third parties, which Ms. Yip treated as deductions from untainted funds, there was $148,545.98 in Account 2887 on February 11, 2008, which Ms. Yip designated as tainted funds from the Ponzi scheme because it was less than the $272,728.61 that had been transferred from Account 4198, which itself held mostly Ponzi scheme deposits; on February 14, 2008, $100,000 was transferred from Account 2750 into Account 2887; then, transfers totaling $227,126.78 were made from Account 2887 to an attorney's account for the purchase of the home; at all relevant points in time, the total amount in Account 2887 exceeded the amount of the transfers to the attorney's account.

Defendants' primary objection to Ms. Yip's analysis is an alleged inconsistency in her application of the lowest intermediate balance rule.  They contend:

> "With sleight of hand, Yip applied a modified form of the standard lowest intermediate balance rule.  She treated transfers from Mr. Lee's Fidelity accounts to third parties as transfers of "untainted" funds until those amounts were exhausted.  However, without explanation, Yip did not use this same treatment for transfers between Mr. Lee's Fidelity accounts.  This is an unjustified deviation from the standard application of the [lowest] intermediate balance rule.  Essentially, this manipulation is little more than a mechanism designed to produce the results desired by the Receiver."[64]

The Defendants misconstrue the applicable principles employed by courts to preserve a trust *res*.  When funds are withdrawn from an account holding commingled funds, ordinarily the presumption is that non-trust funds are withdrawn first, thereby preserving as much of the

---

[63] Debtor also made two deposits totaling $1,786.81 and had two "change[s] in investment value" totaling $1,620.17.

[64] Doc. No. 22, p. 12.

beneficiary's trust funds for as long as possible.[65]  This presumption, however, is at the option of the trust beneficiary.[66]

There is also a fundamental difference between Debtor's payments to third parties from commingled funds – treated as diminishing non-trust funds – and Debtor's transfers to himself, from one of his accounts to another.  The applicable principles of restitution require treating the latter in a manner that also preserves the trust *res*, where the funds retain their tainted character as long as the original recipient is holding them.  Otherwise, any recipient of a fraudulent trust *res* could change the character of the funds by moving the money from one account to another.

The Court has carefully considered Ms. Yip's analysis and the tables attached to her Declaration.  Ms. Yip's findings are the only record evidence before the Court regarding the tracing of Ponzi scheme distributions.  It was appropriate for Ms. Yip to apply established principles of restitution, including the treatment of the diminishing balances in Accounts 2750 and 2887 in accordance with the "lowest intermediate balance rule."[67]  There is a clear path of

---

[65] *In re Hecker*, 316 B.R. at 387 ("When a person who is subject to a trust claim commingles the trust funds with funds of his own, and funds are subsequently dissipated, he is presumed to first dissipate his own funds rather than funds held in trust, such that the funds remaining in an account are presumed to be those held in trust."); *Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988) ("This is based on the fiction that the trustee would withdraw non-trust funds first, retaining as much as possible of the trust fund in the account"); *In re Dameron*, 155 F.3d 718, 724 (4th Cir. 1998).

[66] Restatement (Second) of Trusts § 202 (1959), comment i.  "Where the trustee deposits in a single account in a bank trust funds and his individual funds, and subsequently makes withdrawals from the bank account and dissipates the money so withdrawn, the beneficiary is entitled to an equitable lien upon the balance remaining in the bank for the amount of trust funds deposited in the account…The beneficiary's lien is not restricted to any part of the deposit but extends to the whole deposit and can be enforced against any part of the funds remaining on deposit *and against any funds which are withdrawn, so long as they can be traced*.  So also, there is no inference that the trustee withdraws his own funds first.  *If the funds withdrawn are preserved or can be traced, the beneficiary can enforce an equitable lien upon them or their product*, even though the funds remaining on deposit are subsequently dissipated" (emphasis added).

[67] *See Conn. Gen.*, 838 F.2d at 619 (citing 4 *Collier on Bankr., supra*, ¶ 541.13, at 541-77) ("The normal rule for construing trust proceeds commingled in a bank account is known as the "lowest intermediate balance test"); *Dameron*, 155 F.3d at 724 ("In cases where the trust property has been commingled, courts resolve the issue with reference to the so-called "lowest intermediate balance" rule"); *Schuyler v. Littlefield*, 232 U.S. 707 (1914); *Cunningham v. Brown*, 265 U.S. 1 (1924)

$100,000 from the Ponzi scheme into Account 2750, with the subsequent transfer of exactly that amount into Account 2887.  That $100,000 retained its character as fraudulent transfers from the Ponzi scheme, from the time the Debtor first deposited them into Account 2750 until he purchased the home with funds drawn from Account 2887.  Ms. Yip's analysis is legally and factually sound.

After reviewing the documents and applying the principles stated above, it is a reasonable conclusion that the entirety of the funds used to purchase the home originated as excess distributions from the Ponzi scheme.  Thus, the $227,126.78 drawn from Account 2887 to purchase is the Receiver's trust *res*, which warrants preservation by imposing an equitable lien and a constructive trust on the home.

The Court further concludes that Defendants should get no credit for any alleged home improvement expenses.  They have not specified what these expenses were for, or how they added any value to the property.  The appraiser's report submitted by Defendants values the home at $300,000 as of October 3, 2014; but, it does not attribute any increase in value above the $227,126.78 purchase price to any particular home improvements.[68]

The assumed $70,000 increase in value over six years is more plausibly the result of market appreciation since 2008.  Accordingly, the Court declines to award the Defendants any "credit" against the $227,126.78 for home improvement expenditures.

Likewise, the Court will not augment the amount of the Receiver's equitable lien to include the $21,419.20 of "tainted" funds remaining in Account 2887 after the home purchase.

---

[68] Doc. No. 22, Exhibit H.  The appraisal is as of October 3, 2014, and is therefore stale.

The Receiver has offered no evidence to show that any of the funds remaining in that account can be traced into the home after it was purchased.[69]

Finally, the Receiver is not entitled to the entire value of the home solely because it was acquired with Ponzi scheme funds.[70]  Nevertheless, an award of prejudgment interest is consistent with the premise of the Receiver's entitlement to recover the fraudulent transfers invested in the home.[71]  The calculation of prejudgment interest has not yet been done following the Eleventh Circuit's remand of the issue.[72]  The Receiver's proof of claim included

---

[69] Payments for the repairs and renovations did not begin until at least April 3, 2008.  *See* Lee Affidavit, Doc. Nos. 22-1 and 22-7 (Earliest date of payment for alleged repairs on list provided in affidavit is dated April 3, 2008.  While Debtor allegedly made repairs in March of 2008, paid for by credit card, the balance regarding those expenses was not actually paid until on April 9, 2008).  Absent new false profits being deposited into Account 2887 after February 25, 2008, the maximum amount of false profits remaining in Account 2887 that could have been utilized for the repairs and renovations is $10,808.64, which was the account balance on March 6, 2008, prior to the first account debit related to the repairs.  *See* Doc. No. 22, Exhibit B.  A full breakdown of Account 2887 during the relevant time period subsequent to February 25, 2008 has not been provided to the Court.

[70] *See Fishbein,* 619 So.2d 267, 271, notes 1 and 2 (Fla. 1993).  *See also In re Hecker*, 264 F. App'x 786, 791 (11th Cir. 2008) ("The amount of an equitable lien can be no more than the amount fraudulently obtained *and used* to benefit the home.") (emphasis added.); *Babbit Elecs., Inc. v. Dynascan Corp*, 915 F.Supp. 335 (S.D. Fla. 1995) (Limiting equitable lien to amount of cash received from fraudulent transfers that was directly traced to the home by paying off the mortgage, and not including funds used to purchase stock); *Flinn v. Doty*, 2017 WL 923508 (4th DCA Fla. March 8, 2017) (holder of equitable lien was entitled to foreclose on the lien "to the extent that the lien secured monies paid to satisfy [holder]'s mortgage on the property," and lien did not include other money unjustly obtained that was not directly invested in the home).

[71] *See Donnell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008) ("[P]rejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money."); *Montage Grp., Ltd. v. Athle-Tech Comput. Sys., Inc.*, 889 So.2d 180, 199 (Fla. 2d D.C.A. 2004) (reversing trial court for failure to award prejudgment interest on unjust enrichment award); *Burr v. Norris*, 667 So.2d 424, 426 (Fla. 2d D.C.A. 1996) (reversing and remanding with instructions to trial court to award prejudgment interest on unjust enrichment award).

[72] In its order affirming, the Eleventh Circuit stated that "[t]he general rule is that prejudgment interest is an element of pecuniary damages, and Florida courts have awarded prejudgment interest on FUFTA claims and on unjust enrichment claims as a matter of course."  *Wiand v. Lee*, 753 F.3d 1194, 1205 (11th Cir. 2014).  *See Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 215 (Fla. 1985) ("[W]hen a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss."); *See also Bosem v. Musa Holdings, Inc.*, 46 So.3d 42, 44-46 (Fla. 2010) (reaffirming *Argonaut*'s loss theory).

The Eleventh Circuit remanded the issue of pre-judgment interest calculation, which was not initially awarded, and instructed the magistrate judge to "cite specific equitable considerations recognized under Florida law," including the factors stated in *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286, 1298 (11th Cir. 2002), if it would be inequitable to award prejudgment interest.  As this issue has also not been decided on remand, the

17

prejudgment interest of $451,706.21 on the entire amount of the fraudulent transfer judgment.[73] A proration of that judgment amount ($227,126.78/$935,631.51) would imply prejudgment interest on the $227,126.78 of $109,652.76;[74] but the parties will be given the opportunity to present further argument on that issue.

CONCLUSION

Summary judgment is due to be granted for the Receiver.  There are no material facts in dispute to be tried.  There are no issues of witness credibility.  The Fidelity Accounts' records demonstrate that the entirety of the funds Debtor used to purchase the home, $227,126.78, came from fraudulent transfers from the Ponzi scheme.  The Receiver is entitled to the remedies of an equitable lien and a constructive trust in the amount of $227,126.78, plus pre-judgment interest.

Accordingly, it is

**ORDERED**:

1.   The Defendants' home, with the address of 4018 Via Miranda, Sarasota, Florida, shall hereby be encumbered by an equitable lien for the Receiver in the amount of $227,126.78, plus pre-judgment interest, and a constructive trust in such amount.

2.   The Receiver's lien shall be superior to any claim of the Defendants, who shall not interfere with the Receiver's foreclosure of such lien or sale of the property.  The amount of the Receiver's equitable lien (and any administrative expenses associated

---

Defendants may present arguments against the award of prejudgment interest, to which the Receiver will be given the opportunity to respond.

[73] The proof of claim does not state what interest rate was used to calculate this amount, but the Court assumes it was the Florida prejudgment interest rate at the time.

[74] This proposed prejudgment interest, however, is offered as of the dates of the individual fraudulent transfers, not the purchase of the home.  Interest should accrue from the date of home purchase.

with the sale) shall be paid in full from sale prior to the Defendants receipt of any remaining proceeds.

3.  That the parties shall have 14 days from entry of this order to submit supplemental memoranda setting forth their calculations of the amount of prejudgment interest that should be awarded, or to file a joint stipulation of such interest, after which the court will enter a separate final judgment in accordance with the findings and conclusions set forth herein following the further determination of appropriate interest.

Clerk's office to serve.